UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

———

ANTHONY THOMAS WILLS, #505004,  )
 )
                 Plaintiff,  )      Case No. 1:12-cv-434
 )
v.  )      Honorable Paul L. Maloney
 )
MELISSA BARBER, et al.,  )
 )      **REPORT AND RECOMMENDATION**
              Defendants.  )
_____)

       This is a civil rights action brought *pro se* by a state prisoner under 42 U.S.C. § 1983.

Plaintiff suffers from mental illness. He states that he is "currently diagnosed with antisocial

disorder and personality disorder," but has never been diagnosed as schizophrenic. (2nd Am. Compl.

at 12, ¶ 23, docket # 86, ID # 436). His claims arise out of his confinement at the Ionia Maximum

Correctional Facility (ICF). The defendants are Corrections Officer Joshua Fair, Richard Czop,

M.D., Physician's Assistant Michael Kennerly, Assistant Resident Supervisor (ARUS) Melissa

Barber, and Corrections Officer Maxwell Martin. Plaintiff alleges that Corrections Officer Fair

violated his Eighth Amendment rights by serving him food loaf contaminated with toilet bowl

cleaner on February 14 and 16, 2012, and by slapping his face on February 18, 2012. He alleges that

Physician's Assistant Michael Kennerly violated his Eighth Amendment rights because Kennerly

did not adequately address his "head issue" complaints on February 21, 2012. He alleges that on

April 4 and May 14, 2012, Richard Czop, M.D., found nothing wrong with him and that Dr. Czop

and Mr. Kennerly violated his Eighth Amendment rights when they refused to order the MRI of the

head that plaintiff desired. Plaintiff alleges that Assistant Resident Supervisor (ARUS) Melissa

Barber violated his First Amendment rights on January 24, 2012 by charging him with sexual

misconduct and on February 2, 22, and 23, 2012, by interfering with his outgoing mail. He alleges

that Barber violated his Eighth Amendment rights on February 21, 2012, when she declined to

accede to his request that he be moved to another cell after he complained that his cell was too hot

and he was having difficulty breathing. He alleges that on February 18, 2012, Corrections Officer

Maxwell Martin violated his Eighth Amendment rights by grabbing his neck and forcing him to look

down.

The matter is before the court on the following motions:

- A motion for summary judgment by defendants Czop and Kennerly on the merits of plaintiff's claims (docket # 140);

- A Rule 12(b)(6) motion by defendants Czop and Kennerly seeking dismissal of plaintiff's complaint based on the affirmative defense provided by 42 U.S.C. § 1997e(a) (docket # 104);

- A motion for summary judgment by defendant Fair based on the affirmative defense provided by 42 U.S.C. § 1997e(a) (docket # 71); and

- A motion for summary judgment by defendants Barber and Martin based on the affirmative defense provided by 42 U.S.C. § 1997e(a) (docket # 117).

Plaintiff has filed his response to defendants' motions. (docket #s 76, 81, 112, 123, 135, 151). For

the reasons set forth herein, I recommend that the Rule 12(b)(6) motion filed by defendants Czop

and Kennerly (docket # 104) be dismissed without prejudice on procedural grounds. I recommend,

however, that their motion for summary judgment (docket # 140) be granted and that judgment be

entered in their favor on all plaintiff's claims. I further recommend that the motions for summary

judgment by defendants Fair (docket # 71), Barber and Martin (docket # 117) based on 42 U.S.C.

§ 1997e(a) be granted and that all plaintiff's claims against these defendants be dismissed without prejudice.

## I.     Motion to Dismiss

Defendants Czop and Kennerly filed a Rule 12(b)(6) motion to dismiss based on the affirmative defense provided by 42 U.S.C. § 1997e(a).  Under *Jones v. Bock*, 549 U.S. 199, 216 (2007), exhaustion of administrative remedies is an affirmative defense, on which the defendants bear the burden of proof.  Thus, a plaintiff is not required to plead exhaustion of remedies in the complaint.  Ordinarily, defendants cannot carry their burden on the affirmative defense at the pleading stage.  *Jones v. Bock*, 549 U.S. at 215; *see also Taylor v. Hillis*, 1:10-cv-94, 2011 WL 6341090, at * 3-4 (W.D. Mich. Nov. 28, 2011).  This case is no exception.  I recommend that defendants' procedurally deficient motion to dismiss be denied without prejudice.

## II.     Motions for Summary Judgment

### A.     Summary Judgment Standard

Summary judgment is appropriate when the record reveals that there are no genuine issues as to any material fact in dispute and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c); *Griffin v. Hardrick*, 604 F.3d 949, 953 (6th Cir. 2010).  The standard for determining whether summary judgment is appropriate is "whether 'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Moses v. Providence Hosp. Med. Centers, Inc.*, 561 F.3d 573, 578 (6th Cir. 2009) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)).  The court must consider all pleadings, depositions, affidavits, and admissions on file, and draw all justifiable

inferences in favor of the party opposing the motion.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Pluck v. BP Oil Pipeline Co.*, 640 F.3d 671, 676 (6th Cir. 2011).

When the party without the burden of proof seeks summary judgment, that party bears the initial burden of pointing out to the district court an absence of evidence to support the nonmoving party's case, but need not support its motion with affidavits or other materials "negating" the opponent's claim.  *See Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 787 (6th Cir. 2000); *see also Minadeo v. ICI Paints*, 398 F.3d 751, 761 (6th Cir. 2005).  Once the movant shows that "there is an absence of evidence to support the nonmoving party's case," the nonmoving party has the burden of coming forward with evidence raising a triable issue of fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  To sustain this burden, the nonmoving party may not rest on the mere allegations of his pleadings.  FED. R. CIV. P. 56(e); *see Everson v. Leis*, 556 F.3d 484, 496 (6th Cir. 2009).  The motion for summary judgment forces the nonmoving party to present evidence sufficient to create a genuine issue of fact for trial.  *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478 (6th Cir. 1990); *see Newell Rubbermaid, Inc. v. Raymond Corp.*, 676 F.3d 521, 533 (6th Cir. 2012).  "A mere scintilla of evidence is insufficient; 'there must be evidence on which a jury could reasonably find for the [non-movant].'"  *Dominguez v. Correctional Med. Servs.*, 555 F.3d 543, 549 (6th Cir. 2009) (quoting *Anderson*, 477 U.S. at 252); *see LaQuinta Corp. v. Heartland Properties LLC*, 603 F.3d 327, 335 (6th Cir. 2010).

A moving party with the burden of proof faces a "substantially higher hurdle." *Arnett v. Myers*, 281 F.3d 552, 561 (6th Cir. 2002); *Cockrel v. Shelby County Sch. Dist.*, 270 F.3d 1036, 1056 (6th Cir. 2001).  The moving party without the burden of proof needs only show that the

opponent cannot sustain his burden at trial. "But where the moving party has the burden -- the plaintiff on a claim for relief or the defendant on an affirmative defense -- his showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986) (quoting W. SCHWARZER, *Summary Judgment Under the Federal Rules: Defining Genuine Issues of Material Fact*, 99 F.R.D. 465, 487-88 (1984)). The Court of Appeals has repeatedly emphasized that the party with the burden of proof faces "a substantially higher hurdle" and "'must show that the record contains evidence satisfying the burden of persuasion and that the evidence is so powerful that no reasonable jury would be free to disbelieve it.'" *Arnett*, 281 F.3d at 561 (quoting 11 JAMES WILLIAM MOORE, ET AL., MOORE'S FEDERAL PRACTICE § 56.13[1], at 56-138 (3d ed. 2000)); *see Surles v. Andison*, 678 F.3d 452, 455-56 (6th Cir. 2012); *Cockrel*, 270 F.2d at 1056. Accordingly, a summary judgment in favor of the party with the burden of persuasion "is inappropriate when the evidence is susceptible of different interpretations or inferences by the trier of fact." *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999). This standard applies to defendants' summary judgment motions asserting failure to exhaust remedies.

B.     Standards Applicable to the Affirmative Defense of Failure to Exhaust Remedies

Defendants Fair, Barber, and Martin have asserted the affirmative defense of plaintiff's failure to exhaust administrative remedies. A prisoner bringing an action with respect to prison conditions under 42 U.S.C. § 1983 must exhaust available administrative remedies. 42 U.S.C. § 1997e(a); *see Jones v. Bock*, 549 U.S. 199, 220 (2007); *Porter v. Nussle*, 534 U.S. 516, 532 (2002); *Booth v. Churner*, 532 U.S. 731 (2001). A prisoner must exhaust available administrative remedies,

even if the prisoner may not be able to obtain the specific type of relief he seeks in the state administrative process. *See Porter*, 534 U.S. at 520; Booth, 532 U.S. at 734. "This requirement is a strong one. To further the purposes behind the PLRA, exhaustion is required even if the prisoner subjectively believes the remedy is not available, even when the state cannot grant the particular relief requested, and even where the prisoner[ ] believes the procedure to be ineffectual or futile." *Napier v. Laurel County, Ky.,* 636 F.3d 218, 222 (6th Cir. 2011) (internal quotations and citations omitted).

In *Jones v. Bock*, the Supreme Court held that "exhaustion is an affirmative defense, and prisoners are not required to specifically plead or demonstrate exhaustion in their complaints." 549 U.S. at 216. The burden is on defendants to show that plaintiff failed to properly exhaust his administrative remedies. The Supreme Court reiterated that "no unexhausted claim may be considered." 549 U.S. at 220. The Court held that when a prisoner complaint contains both exhausted and unexhausted claims, the lower courts should not dismiss the entire "mixed" complaint, but are required to dismiss the unexhausted claims and proceed to address only the exhausted claims. 549 U.S. at 219-24.

In order to exhaust administrative remedies, prisoners must complete the administrative review process in accordance with the deadlines and other applicable procedural rules established by state law. *Jones v. Bock*, 549 U.S. at 218-19. In *Woodford v. Ngo*, 548 U.S. 81 (2006), the Supreme Court held that the PLRA exhaustion requirement "requires proper exhaustion." 548 U.S. at 93. "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules." *Id.* at 90; *see Scott v. Ambani*, 577 F.3d 642, 647 (6th Cir. 2009). Thus, when a prisoner's grievance is rejected by the prison as untimely because it was not filed within the

prescribed period, the prisoner's claim is not "properly exhausted" for purposes of filing a section 1983 action in federal court. 548 U.S. at 90-93; *Siggers v. Campbell*, 652 F.3d 681, 692 (6th Cir. 2011); *see* 42 U.S.C. § 1997e(a). The procedural bar does not apply where the State declines to enforce its own procedural rules. *See Reed-Bey v. Pramstaller*, 603 F.3d 322, 324-25 (6th Cir. 2010).

MDOC Policy Directive 03.02.130 (effective July 9, 2007) sets forth the applicable grievance procedures.[1] In *Sullivan v. Kasajaru*, 316 F. App'x 469, 470 (6th Cir. 2009), the Sixth Circuit held that this policy directive "explicitly required [the prisoner] to name each person against whom he grieved," and it affirmed the district court's dismissal of a prisoner's claim for failure to properly exhaust his available administrative remedies. *Id.* at 470.

Policy Directive 03.02.130 is not limited to the requirement that the individual being grieved be named in the Step I grievance. The following is an overview of the grievance process. Inmates must first attempt to resolve a problem orally within two business days of becoming aware of the grievable issue, unless prevented by circumstances beyond his control. *Id.* at ¶ P. If the mandatory pre-grievance attempt at resolution is unsuccessful, the inmate may proceed to Step I of the grievance process and submit a completed grievance form within five business days of the attempted oral resolution. *Id.* The Policy Directive also provides the following directions for completing Step I grievance forms: "The issues should be stated briefly but concisely. Information provided is to be limited to the *facts* involving the issue being grieved (i.e., who, what, when, where, why, how). Dates, times, places, and names of all those involved in the issue being grieved are to

---

[1]Copies of the policy directive are found in the record. *See* docket # 72-2, ID#s 309-15; docket # 118-2, ID#s 690-96.

be included." *Id.* at ¶ R (emphasis in original). Thus, where an individual is not named in the Step I grievance, or his or her involvement in the issue being grieved is not indicated, or the individual is mentioned for the first time during an appeal of a denial of a grievance, the claims against that individual are not properly exhausted. *See Ketzner v. Williams*, No. 4:06-cv-73, 2008 WL 4534020, at * 16 (W.D. Mich. Sept. 30, 2008) (collecting cases); *accord Sullivan v. Kasajaru*, 316 F. App'x at 470.

The inmate submits the grievance to a designated grievance coordinator who makes an initial determination whether it should be rejected under MDOC policy or assigns it to a respondent. P.D. 03.02.130 at ¶¶ W, X. If the inmate is dissatisfied with the Step I response, or does not receive a timely response, he may appeal to Step II by obtaining an appeal form within ten business days of the response, or if no response was received, within ten business days after the response was due. *Id.* at ¶ BB. The respondent at Step II is designated by the policy. The Step II respondent is generally the warden or her designee. *Id.* at ¶ DD. If the inmate is dissatisfied with the Step II response, or does not receive a timely Step II response, he may appeal to Step III using the same appeal form. *Id.* at ¶ FF. The Step III appeal form must be sent to the Grievance and Appeals Section within ten business days after receiving the Step II response, or if no Step II response was received, within ten business days after the date the Step II response was due. *Id.* at ¶ FF. The Grievance and Appeals Section is the Step III respondent. *Id.* at ¶ GG. Time limitations shall be adhered to by the inmate and staff at all steps of the grievance process. *Id.* at ¶ S. "The total grievance process from the point of filing a Step I grievance to providing a Step III response shall generally be completed within 120 calendar days unless an extension has been approved in writing." *Id.*

Ordinarily, a prisoner must pursue appeals of his grievance through Step III of the administrative process. The Sixth Circuit has "clearly held that an inmate does not exhaust available administrative remedies when the inmate fails entirely to invoke the grievance procedure." *Napier*, 636 F.3d at 224. An argument that it would have been futile to file a grievance does not suffice. Assertions of futility do not excuse plaintiff from the exhaustion requirement. *See Napier*, 636 F.3d at 224; *Hartsfield v. Vidor*, 199 F.3d 305, 309 (6th Cir. 1999) ("[A]n inmate cannot simply fail to file a grievance or abandon the process before completion and claim that he has exhausted his remedies or that it is futile for him to do so because his grievance is now time-barred under the regulations."); *see Booth v. Churner*, 532 U.S. at 741 n.6 ("[W]e will not read futility or other exceptions into statutory exhaustion requirements where Congress has provided otherwise.").

C.    Proposed Findings of Fact

The following facts are beyond genuine issue. Plaintiff is in the custody of the Michigan Department of Corrections (MDOC) on criminal convictions.[2]

1.    Degrading Sexual Comments that Plaintiff Made to Defendant Barber

On January 23, 2012, plaintiff was an inmate at the Ionia Maximum Correctional Facility (ICF). On that date, he received a major misconduct charge for sexual misconduct for the degrading statements he made to ARUS Melissa Barber. There is no need to reproduce plaintiff's

---

[2]Plaintiff's most recent criminal conviction arises out of his attack on a female corrections officer at the Richard A. Handlon Correctional Facility (MTU). On September 27, 2011, plaintiff was sentenced in Ionia County Circuit Court as a second habitual offender to a consecutive 95-to-180 month sentence following his plea-based conviction for assault with intent to commit sexual penetration. MICH. COMP. LAWS § 750.520g(1). On June 4, 2013, he filed a habeas corpus petition in this court under 28 U.S.C. § 28 U.S.C. § 2254 seeking relief from his conviction and sentence. *See Wills v. Woods*, 1:13-cv-606 (W.D. Mich.).

statements herein, because they appear in the hearing officer's major misconduct report dated February 1, 2012. The hearing officer found plaintiff guilty of the major misconduct and imposed the sanction of 20 days of detention. (docket # 86-1, ID# 447).

> 2. Medical Care

On February 16, 2012, a nurse reviewed plaintiff's chart in relation to an impending food loaf restriction. (Czop Decl. ¶ 7, docket # 140-2, ID# 891). The nurse advised prison food service that there were no medical contraindications to serving plaintiff food loaf.[3] (docket # 142-4, ID# 1140).

On February 18, 2012, at approximately 8 p.m., plaintiff complained that he was experiencing chest pains. Plaintiff's cardiac exam and chest exam results were normal. A prison nurse contacted Richard Czop, M.D., a licensed physician. (Czop Decl. ¶ 2, ID# 890). The nurse related that plaintiff was extremely anxious and was crying in front of custody staff. He did not exhibit any of the symptoms of a heart attack. Plaintiff was not vomiting. He did not report nausea or neurological symptoms. Dr. Czop determined that plaintiff's symptoms stemmed from anxiety and that no emergency or other treatment was warranted. Plaintiff was returned to his housing unit. (Czop Decl. ¶ 9, ID# 892; docket # 142-5, ID#s 1142-43).

On February 20, 2012, plaintiff related to a prison nurse that he had experienced a gradual onset of gastrointestinal discomfort. He indicated that its severity was "mild-moderate."

---

[3]"Food loaf is a substance prepared by grinding up and combining the various components of a regular prison meal. This substance is formed into a loaf and baked. The baked loaf is then tightly wrapped in plastic and served to the inmate without tray or utensils." *United States v. Mich.*, 680 F. Supp. 270, 271-72 (W.D. Mich. 1988). Food loaf is a disciplinary restriction imposed in response to prisoner misconduct. *See Griffis v. Gundy*, 47 F. App'x 327 (6th Cir. 2002); *Turnboe v. Gundy*, 25 F. App'x 292, 293 (6th Cir. 2001).

(Czop Decl. ¶ 10, ID# 892; docket # 142-5, ID# 1146). After his vitals were taken, plaintiff started vomiting. He told the nurse that he had been vomiting since February 16, 2012. The nurse contacted Dr. Czop, and he examined plaintiff later that day. He found that plaintiff was in no apparent distress. Plaintiff was well nourished and well developed. Plaintiff complained of an episode of persistent vomiting. He had a history of being non-compliant with directions from health care services. Dr. Czop noted that plaintiff had recently been placed on food loaf. "Manipulative behavior" was the most likely diagnosis. However, given the possible tenderness in the right lower quadrant of plaintiff's abdomen, Dr. Czop needed to rule out acute intra-abdominal pathology or illicit ingestion. Dr. Czop ordered that plaintiff be transported outside the maximum security prison and taken to the emergency room at Sparrow Hospital in Ionia. Dr. Czop discussed the case with the attending physician. (Czop Decl. ¶ 11, ID# 893; docket # 142-5, ID#s 1144-45, 1147). Plaintiff made no claim that he had been poisoned. He received a series of tests, and his nausea was treated with Phenergan. Doctors at Sparrow Hospital determined that his stomach upset had been caused by a virus. Plaintiff was treated with fluids, and he was advised to limit his intake of solid foods until tolerated.

Michael Kennerly is a licensed physician's assistant. (Kennerly Decl. ¶ 2, docket # 140-4, ID# 913). On February 21, 2012, he conducted a follow-up examination after plaintiff's emergency room visit. Plaintiff was eating and drinking and had experienced no further abdominal pain since his return to prison. Kennerly did not observe any symptoms that would lead him to believe that plaintiff was suffering from the ingestion of toxic substances. Plaintiff's record was

fully consistent with the progression of symptoms with "viral gastroenteritis, the 'stomach flu.'"[4] (Kennerly Decl. ¶¶ 12-14, ID#s 916-17; docket # 142-5, ID#s 1150, 1261-67).

On March 1, 2012, plaintiff complained to Kennerly that he was experiencing right shoulder pain. He stated that the discomfort started after doing his daily 100 push-ups. Physician's Assistant Kennerly gave plaintiff Tylenol and ordered a "warm compress." (Kennerly Decl. ¶ 15, ID# 918; docket # 142-5, ID# 1152).

On March 8, 2012, plaintiff told Kennerly that he began experiencing lower back pain and tightness after eating his food loaf on February 16, 2012. Kennerly noted that plaintiff had walked into the segregation unit's examination room without any difficulty. He found that plaintiff was in no apparent distress. His back was "non-tender." He had normal musculature and his extremities were normal. His cranial nerves were intact and he had no motor or sensory deficits. Plaintiff's head was "[n]ormocephalic." Plaintiff was alert and oriented. Physician's Assistant Kennerly found no evidence of unusual anxiety or depression. In light of the consistently normal findings on examination and plaintiff's "vague" symptoms, Kennerly ordered a series of tests. (Kennerly Decl. ¶ 16, ID#s 918-19; docket # 142-5, ID#s 1154-56).

On March 10, 2012, plaintiff walked into the clinic area and complained that he had not been able to keep food down since February 20th. Nurse Sickler found that plaintiff's vital signs were normal. His oral cavity was "clean with no smell of vomit." Plaintiff was advised to drink

_____

[4]Czop and Kennerly note that if plaintiff had actually ingested toilet bowl cleaner on the dates he now claims, he would have experienced a much earlier onset of vomiting than the stomach discomfort which resulted in his trip to the emergency room on February 20, 2012. (Czop Decl. ¶ 23, ID#s 897-98; Kennerly Decl. ¶ 14, ID# 917). "Had the patient been poisoned on February 16, [Dr. Czop] would expect severe symptoms immediately after ingestion." (Czop Decl. ¶ 24, ID# 898).

water, eat food as tolerated, and see health care as scheduled. (docket # 142-5, ID# 1157). On March 13, 2012, plaintiff told Nurse Lorentz that he had not been able "to keep food down since the 16th." He complained of tightness in his lower back. His vital signs remained normal. He was advised to report to sick call if his symptoms did not subside. (docket # 142-5, ID# 1159).

On March 20, 2012, plaintiff reported to a nurse that he was eating everything on his meal trays. She noted that plaintiff had lost about ten pounds over a three-month period. (docket # 142-5, ID# 1161). On March 27, 2012, the nurse noted that plaintiff had gained three pounds in a week. (docket # 142-5, ID# 1162). In April 2013, the nurse noted that plaintiff's weight was stable. (docket # 142-5, ID# 1163).

On April 4, 2012, plaintiff began providing Dr. Czop with significantly embellished symptoms, combined with behavior which led Czop to conclude that he was feigning illness:

> 30 yo on call out for nausea and neck pain. He says GI symptoms began abruptly on 2/16/12 "after second shift food loaf." He reports pain on both sides of his spine from his sacrum to his skull, headache, constant dizziness, head and facial numbness, a [weight] on his brain pushing his head down. Officers report that shortly before this call out, he was in the yard for an hour and appeared normal. On arrival in the exam area, he began near continuous retching and spitting of saliva. At the conclusion of my assessment he walked normally w/o retching all the way back to his cell.

(docket # 142-5, ID# 1164). Dr. Czop suspected that plaintiff was engaged in manipulative behavior. His progression of symptoms had been consistent with the stomach flu and utterly inconsistent with being poisoned, which would have caused severe symptoms immediately after ingestion. None of the objective test results supported plaintiff's belated assertion that he had been poisoned. Nonetheless, Dr. Czop performed a full examination on April 4, 2012, because there was a possibility that the symptoms plaintiff incorrectly attributed to being poisoned had some other cause. On examination, Dr. Czop found no physical or psychiatric abnormality. Plaintiff's

-13-

symptoms were "multiple and varied" and did not correlate with any clinically identifiable organ dysfunction. His behavior was "bizarre." Plaintiff wanted even more tests, but in Dr. Czop's medical judgment, the recent laboratory tests provided enough information. (Czop Decl. ¶¶ 22-23, ID#s 897-98; docket # 142-5, ID# 1165). Nonetheless, Dr. Czop ordered yet another round of tests, which returned "excellent" results. (Czop Decl. ¶¶ 25-26, ID# 898; docket #s 142-5, ID# 1167-68).

On April 18, 2012, plaintiff complained to Physician's Assistant Kennerly that he had been experiencing weight loss. Kennerly noted that plaintiff's weight was the same as it had been in 2009. (Kennerly Decl. ¶ 26, ID# 922; docket # 142-5, ID#s 1169-70).

On May 14, 2012, Dr. Czop noted that plaintiff described a wide variety of symptoms: "Says his head and his eyes get really hot. He has constant total face numbness that gets worse at times. Gets headaches that begin in the left occipital area that generalize. All these symptoms date back to 2/16/12 as per the above note. 'I still throw up, but not as bad as it was.' He says his weight is stable. He says Tylenol does not affect his headaches." Plaintiff went on to complain that he experienced short, sharp chest pains "that last for about 3-4 seconds and it's like it 'zaps my energy, the[n] my head hurts and feels like acid bubbling in it, then my face will do the same thing and so will my eyes.'" Dr. Czop informed plaintiff that there was no medical explanation for the symptoms he reported: "I told him that I [could] not find a disease or other pathologic process that would account for his symptoms. I reassured him that I believe h[e] is likelier to improve than to require further study, but [] I will check him again in six weeks." (Czop Decl. ¶ 29, ID# 900; docket # 142-5, ID#s 1173-74).

On May 16, 2012, plaintiff complained to a nurse that he had experienced headaches "every day since 2-16-12." He stated that the Tylenol he received was not providing adequate relief.

Plaintiff was advised to take over-the-counter pain medications as needed and his name was placed on the medical call-out list. (docket # 142-5, ID# 1172).

In June 2012, a nurse removed plaintiff's ear wax build-up. In July, he received ear drops. On July 16, 2012, Dr. Czop wrote: "He doesn't know how his ears feel today." The examination returned normal results. Plaintiff's ears were "unremarkable." Nonetheless, Dr. Czop gave plaintiff ear drops. (Czop Decl. ¶ 31, ID# 901; docket # 142-5, ID#s 1176-85).

In August 2012, plaintiff began complaining to nurses that he was experiencing "blurry vision, white dots and eyes burning." Plaintiff claimed that he had experienced these symptoms for five months. He was advised to avoid activity that causes eye strain. In September, plaintiff complained of ringing in his ears. He stated: "The right side of my face feels like its paralyzed. My face turns warm, and the right side under my eye feels numb [, especially] under my right eye. Th[e]n my head starts to hum." The nurse observed no abnormalities. Plaintiff was unable to state what he was doing before experiencing these episodes. (docket # 142-5, ID#s 1189-91).

On September 12, 2012, plaintiff reported to Kennerly that he had been experiencing ringing in his right ear after the noon meal. Plaintiff's examination was unremarkable. Kennerly revised plaintiff's diet to decrease his salt intake. On September 13, 2012, plaintiff complained that "his new glasses were not the right prescription." It was determined that "the lens was made as ordered." Plaintiff was advised that "sometimes it takes a while to get used to a new prescription." In October, plaintiff complained of a painful lump on his chest. It was a pimple or a single pustule/boil which was treated with antibiotics. (Kennerly Decl. ¶ 35, ID#s 295-96; docket # 142-6, ID#s 1193-95, 1202-04).

On January 3, 2013, plaintiff reported that he had been experiencing headaches and dizziness for about two weeks. The nurse noted that plaintiff had made similar complaints "back in May 2012 which did resolve." (docket # 146-2, ID# 1211). On January 7, 2013, plaintiff repeated the same pattern of "multiple complaints: normal exam." (*Id.* at ID# 1213). In February, plaintiff complained that his headache was "like hot water on [his] brain on the right side."[5] (*Id.* at ID# 1215). On March 16, 2013, it was noted that plaintiff used wadded-up paper as ear plugs. His test results were normal. (Czop Decl. ¶¶ 42-47, ID#s 905-08; docket # 142-6, ID#s 1217).

Plaintiff continues to receive medical attention for a variety of complaints, despite the fact that the results of his lab tests and neurological evaluations have been normal. He has received medically appropriate care. (Czop Decl. ¶¶ 48-50, ID# 908; Kennerly Decl. ¶¶ 48-49, ID# 931).

3.     Grievances

Plaintiff's complaint is based on events that allegedly occurred at ICF on and after January 24, 2012, the date he was charged with sexual misconduct. He filed this lawsuit on May 2, 2012. The grievances that plaintiff filed and pursued through a Step III decision are listed herein. The grievances were either unrelated to any claim at issue in this lawsuit, had not been pursued through a Step III decision before plaintiff filed this lawsuit, or both.

---

[5]On March 13, 2013, a nurse made a data entry error when she entered information regarding another prisoner in plaintiff's file. The error was corrected. (docket # 151-1, ID#s 1316-21).

a.      Grievance No. ICF-12-03-0536-17Z

On March 27, 2012, plaintiff filed a grievance and the grievance coordinator assigned it Grievance No. ICF-12-03-0536-17Z. (docket # 162-2, ID#s 1361). Plaintiff complained that he had not received a mental health evaluation by the Forensics Center:

> On 9-27-11 I was sentenced in Ionia County Circuit Court and was told I'd be evaluated by Forensic Center cause of my plea of Guilty But Mentally Ill. On my judgment of sentence # 12 (at the bottom of page) it states Defendant plead mentally ill. Defendant shall be evaluated by Forensics." I've been asking staff about this (psychs and ARUSs) since I arrived here on October 21st 2011. Pursuant to 04.06.180, PD 04.06.182 I have requested [a] mental health evaluation by the Forensics Center as such was recommended by the 8th Judicial Circuit Court Judge Kreeger, see Judgment of Sentence. I just want to know what's going on so I don't have to worry about this stuff.

(*Id.*). The grievance was rejected at Step I because it was untimely. (*Id.* at ID# 1360). Plaintiff appealed. On May 31, 2012, the warden found that this grievance had been resolved at Step II. The warden noted that plaintiff had received a thorough physical and mental health screening when he came through the MDOC's Reception and Guidance Center. Plaintiff would not be transferred to the Forensics Center unless the Mental Health Team determined that it was necessary. (*Id.*). Plaintiff argued in his Step III appeal that he had entered a plea of guilty but mentally ill and that the court's judgment indicated that he should be evaluated by the Forensics Center. (*Id.* at ID# 1359). On October 9, 2012, the Grievance and Appeals Section denied plaintiff's Step III appeal. (*Id.* at 1358).

b.      Grievance No. ICF-12-03-0533-12E1

On March 27, 2012, plaintiff filed a grievance and the grievance coordinator assigned it Grievance No. ICF-12-03-0533-12E1. (docket # 162-2, ID# 1365). Plaintiff complained of a

variety of symptoms he had been experiencing since February 16, 2012, and expressed his desire for additional medical tests:

> I've been sick from something since Feb. 16th. They thought it was the flu at first. I was sent to hospital by doc cause he thought it was my appendix. I wasn't able to eat from Feb. 16th until March 12th. I lost 14 pounds during this entire time, from 127 down to 113. The only tests they took w[ere] blood and urine tests. I haven't been told anything about them. I've been weighed twice since. I'm able to eat but all my symptoms are still there. My spine/kidney area gets tight and puffy. My body heats up really bad especially my head. My chest feels like its got liquid in it and makes me not able to inhale fully. My stomach feels really messed up all the time. I'm constantly dizzy and my head is constantly numb and tingley. I feel like I want to pass out a lot. They've done no other tests to find out what's wrong. Per PD 03.04.100. I have been denied adequate service. I was told by my attorney to do grievance process first.

(*Id.*). The parties neglected to provide the court with a copy of the Step I response.[6] Plaintiff pursued a Step II appeal. He stated that health care was "ignoring a potentially serious problem concerning [his] head." (*Id.* at ID# 1363). Plaintiff's grievance was denied at Step II. The grievance response gave a summary of plaintiff's complaints and the medical care he had received. (*Id.* at ID# 1364). Plaintiff stated in his Step III appeal that he had a "serious medical problem with [his] head" and that he needed a "proper examination." (*Id.* at ID# 1363). On July 30, 2012, the Grievance and Appeals Section denied plaintiff's Step III appeal. It found that the Step II response "appropriately addressed this grievance." (*Id.* at ID# 1362). Plaintiff's failure to agree with the clinical judgment of medical care providers did not substantiate his allegations. (*Id.*).

---

[6]The substance of the Step I response cannot be determined from the Step II materials. (docket # 162-2, ID# 1364).

c.    Grievance No. ICF-12-04-0653-12D1

On April 12, 2012, plaintiff filed a grievance which was assigned Grievance No. ICF-12-04-0653-12D1.  (docket # 162-2, ID#1369).  In this grievance, plaintiff complained that he was not receiving responses to his health care kites:

> I've been very sick since Feb. 16th.  I've been writing kites to Healthcare and have been getting my kites not responded to.  My last kite was on 4-9-12.  It involved my head hurting so bad and me being dizzy, blacking out, really super hot, and my head feeling numb, tingly, and like acid on my head.  I asked to be seen quick and possibly have an MRI done to find out what's wrong.  Also about my weight dropping down to 111 pounds from 127 within 6 weeks.  I have a serious problem and have been told nothing.  My problem gets worse & worse each day.  It's so bad now [my] head feels like it wants to explode.

(*Id.*).  The Step I response indicated that plaintiff's health care kites were being processed in a timely manner and that plaintiff could "address any urgent medical needs to the nursing staff on morning medical rounds if necessary."  (*Id.* at ID# 1370).  Plaintiff's Step II appeal was denied.  Medical records revealed that he had received responses to all his health care kites:

> Mr. Wills' electronic medical record was reviewed.  Documentation revealed three medical health care requests were received in the clinic from 2/16/12 to 4/9/12.  A review of these requests indicated that they were all responded to.  A review of the grievant's record demonstrates a request[] was received on 3/5/12 regarding a liquid diet.  The second complaint was received in the clinic on 3/30/12 regarding a request to have his eyes checked. The third complaint was received in the clinic on 4/5/12 regarding his head hurting.  Grievant is encouraged to utilize the request for health service process to address any current medical needs.

(*Id.* at ID# 1368).  On August 22, 2012, the Grievance and Appeals Section denied plaintiff's Step III appeal.  It found that plaintiff's allegations against staff were not supported.  Plaintiff was "encouraged to utilize the health care request process if he ha[d] concerns or changes in his symptoms so an evaluation with nursing c[ould] be scheduled."  (*Id.* at ID# 1336).

d.      Grievance No. ICF-12-04-0561-28e

On March 28, 2012, plaintiff wrote a grievance regarding an incident which allegedly occurred on March 9, 2012. The grievance coordinator received the grievance on April 2, 2012, and assigned it Grievance No. ICF-12-04-0561-28e. (docket # 162-2, ID# 1373). The grievance was denied at Step I because it was untimely. (*Id.* at ID# 1374). Plaintiff stated that he could not appeal to Step II because the grievance coordinator lost his paperwork. On August 7, 2012, the Grievance and Appeals Section upheld the rejection of plaintiff's grievance. (*Id.* at ID#s 1371-72).

e.      Grievance No. IBC-11-07-1717-09z

On July 6, 2011, plaintiff filed a Step I grievance complaining that the Independence Day meal for prisoners in segregation at the Bellamy Creek Correctional Facility (IBC) had included an orange rather than the pie and ice cream received by general population prisoners. IBC's grievance coordinator assigned Grievance IBC-11-071717-09z. (docket # 162-2, ID# 1378). This grievance was denied at every step of the MDOC's grievance process. (*Id.* at ID#s 1375, 1377, 1379).

f.      Grievance No. IBC-10-08-2098-12d1

On August 3, 2010, a grievance coordinator at IBC received a grievance from plaintiff and assigned it Grievance No. IBC-10-08-2098-12d1. (docket # 162-2, ID# 1383). Plaintiff complained that he was not receiving appropriate care for his "head problem" at IBC:

On 3/8/10 at the MTU [the Richard A. Handlon Correctional] Facility,[7] I was kicked twice in the head. I was transported here to seg. After about a week I started getting really bad pain in my head and started passing out, the first time when I was talking to psych. I saw a nurse and a female doctor who told me to take tylenol and l[ie] down when I got dizzy. It happened again but worse and I was told the same thing and not even checked out. I asked to have my head checked out and got the same response again. It's not normal for someone to have constant head pain and to pass out 4-5 times a day, sometimes more. I want my head checked out to find out what's wrong and not to be told the same thing I've been told for the last 4 months.

(*Id.*). The Step I and II grievance responses indicated that plaintiff was receiving appropriate medical care for the headaches he reported. His Step III appeal was denied because it was untimely. (*Id.* at ID#s 1380, 1382, 1384).

    D.    Defendants Czop and Kennerly

        Plaintiff alleges that Dr. Czop and Physician's Assistant Kennerly were deliberately indifferent to his serious medical needs in violation of his Eighth Amendment rights under the Cruel and Unusual Punishments Clause. In *Estelle v. Gamble*, 429 U.S. 97 (1976), the Supreme Court held that deliberate indifference to a prisoner's serious medical needs, manifested by prison staff's intentional interference with treatment or intentional denial or delay of access to medical care, amounts to the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment. *Estelle*, 429 U.S. at 104-05. In judging the sufficiency of "deliberate indifference" claims, the court must view the surrounding circumstances, including the extent of the injury, the realistic possibilities

---

[7]March 8, 2010, was the date of plaintiff's attack on a female corrections officer at MTU which resulted in his felony conviction for assault with intent to commit sexual penetration. During the sentencing hearing, the victim described the brutal nature of plaintiff's attack and her struggle to survive. The details need not be discussed here. They will be considered when the court addresses plaintiff's habeas corpus petition.

of treatment, and the possible consequences to the prisoner of failing to provide immediate medical attention.  *Westlake v. Lucas*, 537 F.2d 857, 860 n.4 (6th Cir. 1976).

In *Wilson v. Seiter*, 501 U.S. 294 (1991), the Supreme Court clarified the deliberate indifference standard.  Under *Wilson*, a prisoner claiming cruel and unusual punishment must establish both that the deprivation was sufficiently serious to rise to constitutional levels (an objective component) and that the state official acted with a sufficiently culpable state of mind (a subjective component).  501 U.S. at 298.  The Supreme Court held in *Farmer v. Brennan*, 511 U.S. 825 (1994), that deliberate indifference is tantamount to a finding of criminal recklessness.  A prison official cannot be found liable for denying an inmate humane conditions of confinement "unless the official knows of and disregards an excessive risk to inmate health or safety."  511 U.S. at 837.  The Sixth Circuit's decision in *Miller v. Calhoun County*, 408 F.3d 803 (6th Cir. 2005), summarized the subjective component's requirements:

> The subjective component, by contrast, requires a showing that the prison official possessed a sufficiently culpable state of mind in denying medical care.  Deliberate indifference requires a degree of culpability greater than mere negligence, but less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result.  The prison official's state of mind must evince deliberateness tantamount to intent to punish.  Knowledge of the asserted serious needs or of circumstances clearly indicating the existence of such needs, is essential to a finding of deliberate indifference.  Thus, an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment.

*Miller*, 408 F.3d at 813 (citations and quotations omitted).  Where a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second-guess medical judgments and constitutionalize claims which sound in state tort law.  *See Alspaugh v. McConnell*, 643 F.3d 162, 169 (6th Cir. 2011); *Westlake*, 537 F.2d 860 n.5; *see also Reed v. Speck*, 508 F. App'x 415, 419 (6th Cir. 2012) ("The subjective component is

intended 'to prevent the constitutionalization of medical malpractice claims.'") (quoting *Dominguez v. Corr. Med. Servs.*, 555 F.3d 543, 550 (6th Cir. 2009)).

Plaintiff has not presented evidence sufficient to support either the objective or the subjective component of an Eighth Amendment claim. He argues: "Just 'cause blood tests are normal and other parts of the body are normal does not mean a person's head is." (Plf. Brief at 1, docket # 151, ID# 1310). The record is devoid of any diagnosis of a disease or medical condition sufficiently serious to rise to constitutional levels.

Plaintiff has not presented evidence sufficient to support the subjective component of an Eighth Amendment claim for deliberate indifference to serious medical needs. There is no evidence of any deficiency in his medical care. Plaintiff's disagreement with the treatment provided falls far short of supporting an Eighth Amendment claim. *See e.g.*, *Kosloski v. Dunlap*, 347 F. App'x 177, 180 (6th Cir. 2009); *Hix v. Tennessee Dep't of Corr.*, 196 F. App'x 350, 357 (6th Cir. 2006).

I find that defendants Czop and Kennerly are entitled to judgment in their favor as a matter of law on all plaintiff's claims.

E.      Defendants Fair, Barber, and Martin

Defendants Fair, Barber, and Martin have raised the affirmative defense that plaintiff did not properly exhaust his administrative remedies against him as required by 42 U.S.C. § 1997e(a). Exhaustion is mandatory. *Woodford*, 548 U.S. at 85. "[N]o unexhausted claim may be considered." *Jones v. Bock*, 549 U.S. at 220. Defendants Fair, Barber, and Martin are members of the prison's custody staff, not medical staff. The grievances that plaintiff pursued through a decision by the Grievance and Appeals Section generally concerned perceived inadequacies in his medical

care, with the notable exception of his grievance about being served an orange on Independence Day, rather than pie and ice cream.

Plaintiff alleges that Corrections Officer Fair violated his rights under the Eighth Amendment's Cruel and Unusual Punishments Clause by serving him food loaf contaminated with toilet bowl cleaner on February 14 and 16, 2012, and by slapping his face on February 18, 2012. Plaintiff did not file any grievance corresponding to these claims, nor did he pursue such grievances through a Step III decision by the Grievance and Appeals Section before he filed this lawsuit.

Plaintiff argues that his failure to exhaust his "toilet bowl cleaner" claims[8] against Officer Fair should be excused because he made attempts to file a grievance against defendant Fair on February 22, 2012 by handing a grievance to ARUS Barber, and on March 12, 2012, by handing the same grievance to Grievance Coordinator Breedlove. (Plf. Decl. ¶¶ 2, 3, docket # 76, ID#s 356-57). Plaintiff did not make any attempt to pursue this purported grievance through Steps II and III of the MDOC's grievance process. The exhibits filed by the parties in this matter establish that plaintiff had access to the MDOC's grievance process and used it constantly. (*See e.g.*, docket # 1-1, ID#s 9-12; docket # 82-1, ID#s 380-90; docket # 106, ID#s 620-36; docket # 137-1, ID#s 855-56; docket # 162-2, ID#s 1349-89).

Alternatively, plaintiff argues that he exhausted his toilet bowl cleaner claims against defendant Fair through Grievance No. ICF-12-07-1127-12D2. (Plf. Brief at 1-2, docket # 81, ID# 365-66). The grievance number alone shows that plaintiff could not possibly have exhausted this grievance before he filed this lawsuit on May 12, 2012. The "12-07" portion of the grievance

---

[8]Plaintiff did not file a copy of the purported grievance which "contained the issue of C/O Fair placing toilet bowl cleaner in his food loaf." (Plf. Decl. ¶ 2, docket # 76, ID# 356).

number indicates that it was filed in July 2012, months *after* plaintiff filed this lawsuit. This is further reinforced by the date of plaintiff's appeal to Step II, July 27, 2012.[9] (docket # 81-2, ID# 380). In any event, Grievance No. ICF-12-07-1127-12D2 was a complaint about perceived inadequacies in the medical care provided for plaintiff's "head issue," not any action taken by defendant Fair. (docket # 81-2, ID# 380-81). Plaintiff did not properly exhaust his administrative remedies on any claim against Officer Fair.

Plaintiff's argument that he could not pursue grievances against defendants Barber and Martin are of the same ilk and equally unsupported. Plaintiff states that Barber threw away his grievances and that ICF's grievance coordinator would not process his grievances.[10] (docket # 123, ID# 719). This argument is untenable given the number of grievances filed as exhibits in this matter. Further, it is undermined by plaintiff's "supplemental" exhibit. (docket # 135-1, ID# 847). Plaintiff filed a grievance against defendant Barber on April 4, 2012, and ICF's grievance coordinator

---

[9]A prisoner cannot file his lawsuit first and then exhaust his administrative remedies after-the-fact. *See Garren v. Prisoner Health Servs.*, No. 11-14650, 2012 WL 4450495, at * 2 (E.D. Mich. Aug. 6, 2012); *Rhinehart v. Scutt*, No. 2-10-cv-10006, 2011 WL 679699, at * 5 (E.D. Mich. Jan. 14, 2011); *Ross v. Duby*, No. 1:09-cv-531, 2010 WL 3732234, at * 1 (W.D. Mich. Sept. 17, 2010).

[10]Plaintiff was transferred to Baraga Maximum Correctional Facility in June 2013. (docket # 155). Assuming that ICF's grievance coordinator somehow thwarted plaintiff's attempt to file a grievance, plaintiff would have had upon transfer, and may yet still have, an opportunity to properly exhaust his available administrative remedies. *See Arrington v. Scott,* No. 1:12-cv-529, 2013 WL 1080296, at * 2 (W.D. Mich. Mar.14, 2013) ("It was incumbent upon plaintiff upon his transfer [ ] to file grievances corresponding to all the claims he is now asserting against defendants, including the explanations documenting his reasons for the delayed filing of each grievance, and to pursue all those grievances through Step III decisions."). Under paragraph G(4) of the Policy Directive, an otherwise untimely grievance will not be rejected "if there is a valid reason for the delay." (P.D. 03.02.130 ¶ G(4), docket # 118-2, ID# 691). Assertions of futility do not excuse plaintiff from the exhaustion requirement. *See Napier*, 636 F.3d at 224; *Hartsfield v. Vidor*, 199 F.3d at 309.

assigned it Grievance No. ICF-12-04-0561-21E. (*Id.*). The grievance appeal records (docket #162-2, ID#s 1371-74) show that plaintiff filed this lawsuit long before he exhausted his available administrative remedies on his grievance against ARUS Barber. Plaintiff did not properly exhaust his administrative remedies on any claims against defendants Martin and Barber before he filed his complaint. I find that defendants Fair, Barber, and Martin have carried their burden on the affirmative defense and they are entitled to dismissal of all of plaintiff's claims.

The only remaining question is whether the dismissal of plaintiff's claims against defendants Fair, Barber, and Martin should be with or without prejudice. Generally, the dismissal of claims for failure to exhaust administrative remedies as required by 42 U.S.C. § 1997e(a) is without prejudice. *See Bell v. Konteh*, 450 F.3d 651, 654 (6th Cir. 2006). Defendants have not presented any developed argument why dismissal with prejudice would be appropriate.

## **Recommended Disposition**

For the reasons set forth herein, I recommend that the procedurally deficient Rule 12(b)(6) motion filed by defendants Czop and Kennerly (docket # 104) be dismissed without prejudice on procedural grounds. I recommend that the motion for summary judgment by defendants Czop and Kennerly (docket # 140) be granted and that judgment be entered in their favor on all plaintiff's claims. I recommend that the motions for summary judgment by defendants Fair (docket # 71), Barber and Martin (docket # 117) based on 42 U.S.C. § 1997e(a) be granted and that all plaintiff's claims against these defendants be dismissed without prejudice.

Dated:  March 12, 2014          /s/  Joseph G. Scoville
                                United States Magistrate Judge

## <u>NOTICE TO PARTIES</u>

Any objections to this Report and Recommendation must be filed and served within fourteen days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b).  All objections and responses to objections are governed by W.D. MICH. LCIVR 72.3(b).  Failure to file timely and specific objections may constitute a waiver of any further right of appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Branch*, 537 F.3d 582, 587 (6th Cir.), *cert. denied*, 129 S. Ct. 752 (2008); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596-97 (6th Cir. 2006).  General objections do not suffice.  *Spencer v. Bouchard*, 449 F.3d 721, 724-25 (6th Cir. 2006); *see Frontier*, 454 F.3d at 596-97; *McClanahan v. Comm'r of Social Security*, 474 F.3d 830, 837 (6th Cir. 2006).